# DEMAND PROMISSORY NOTE AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the receipt and sufficiency of which is hereby acknowledged, each of the undersigned dealers (hereinafter referred to jointly and severally as the "DEALER" which term shall mean as applicable each of the undersigned individually and all of the undersigned collectively) on behalf of themselves individually and in their representative capacity hereby promises to pay to the order of Vehicle Acceptance Corporation ("LENDER") or its successors or assigns, with its principal office specified in Section 9.4 or such other place as LENDER or its successors or assigns may designate in writing to DEALER, the principal sum of $300,000.00 (the "Aggregate Advance Limit") or such greater or lesser principal amount as may be outstanding pursuant hereto, with interest on any outstanding balance prior to an Event of Default, as defined in Section 7.0 hereof, at the rate of interest (based upon a 360 day year, compounded daily) of 12% per annum and as amended from time to time; Interest shall accrue from, the earlier of the date of a requested Advance or the date that an Obligation is incurred and shall be compounded daily. After an Event of Default, interest shall accrue at a rate of eighteen percent (18%) per annum, with such interest compounded daily and accruing from the date on which the Event of Default first occurred. All payments shall be made in lawful money of the United States and in immediately available funds, whether in cash, via check, via ACH, via certified funds, or otherwise.

Until demand by LENDER or until an Event of Default (at which time the Obligations shall at LENDER's option and without notice become immediately due and payable in full), DEALER shall pay the Obligations as provided in Section 2.6.

The DEALER: (a) waives demand, grace, presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of non-payment, notice of intent to accelerate the maturity hereof and of acceleration and any other notice required to be given under the law in connection with the delivery, acceptance, performance, default or enforcement of this Note; (b) consents to any extension of the time of payment hereof; (c) waives all defenses based on suretyship or impairment of collateral; and (d) waives any defenses which the DEALER may assert on the Obligations including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, statute of limitations, LENDER liability, accord and satisfaction, and usury. The DEALER further consents to all delays, extensions, renewals or other modifications of this Note, or waivers of any provisions of this Note, or LENDER's release or discharge of any person or entity who is or may become liable for the obligations under this Note, whether as surety or otherwise, or the release, substitution or exchange of any security or collateral (if any) for the payment of this Note, or LENDER's failure to act, or any indulgence shown by LENDER and agree that no such action, failure to act or failure to exercise any right or remedy by LENDER shall in any way affect the obligations of any such party or be construed as a waiver by LENDER of, or otherwise affect, any of LENDER's rights under this Note.

In consideration of the premises and the mutual covenants and conditions contained herein, the parties further agree as follows:

## AGREEMENT

1.0 **DEFINITIONS.** When used herein, the following terms shall have the following meanings:

1.1 ACH - an electronic network for financial transactions, also known as automated clearing house payment system, which processes credit and debit transactions including payments by or on behalf of DEALER or LENDER.

1.2 Advance - discretionary loan(s) to DEALER or payment(s) on behalf of DEALER by LENDER pursuant to the terms of this Note.

1.3 Aggregate Advance Limit - the maximum lending limit, as set forth above. The Aggregate Advance Limit is also referred to as the Commitment amount, which represents the maximum principal balance that the LENDER will lend to the DEALER. At the sole discretion of the LENDER and subject to additional fees as defined in Section 1.31 this limit may not be exceeded by more than ten percent (10%).

1.4 Available Credit — the amount defined as the Aggregate Advance Limit minus the Current Principal Balance.

1.5 Check - a payment by or on behalf of DEALER to LENDER which is other than a payment in cash, via ACH or via certified funds.

1.6 Collateral - all of DEALER's assets and properties wherever located and whether now owned or hereafter acquired, including without limitation (a) all machinery, furniture, and Equipment of any kind, (b) all Vehicles, vehicle parts, and other Inventory of any kind including, without limitation, the Purchase Money Inventory as hereinafter defined, (c) all Documents, including but not limited to Titles, Goods, Accounts, receivables, Retail Installment Contracts, contract rights, Chattel Paper, Electronic Chattel Paper, Goods, leases, insurance policies, Instruments, intellectual property (including patents, copyrights, trademarks, trade secrets and all rights relating thereto), Fixtures, Investment Property, Money, certificates of deposit, Deposit Accounts, Letter of Credit

© 2019 Vehicle Acceptance Corporation. All R


**EXHIBIT**

A

Rights, Supporting Obligations, and General Intangibles (including payment intangibles) now owned or hereafter acquired by DEALER, (d) any and all proceeds, products, additions, accessions, accessories, and replacements of the foregoing, (e) all of DEALER's computer records, software, business papers, ledger sheets, files, books, and records relating to the foregoing, now owned or hereafter acquired, (f) all Proceeds of the foregoing and, to the extent not otherwise included, all payments under insurance (whether or not LENDER is the loss payee thereof and including without limitation, casualty or hazard insurance and policies of owner's or mortgagee's title insurance), or rights of loss payee or endorsee thereof, and escrow agreements, all tax, insurance, security or other deposits, and rights acquired by reason of condemnation or exercise of the power of eminent domain, and (g) all other property and rights of every kind and description and interests therein. All capitalized terms used in the definition of "Collateral" and not otherwise defined herein shall have the meanings given to them in the UCC and shall be used herein with the same meanings.

1.7 Curtailment Date - that certain day at the end of the Period when all Obligations concerning or relating to an item of Purchase Money Inventory become due and payable. A principal reduction is required at the curtailment date in the amount required by the LENDER.

1.8 DEALER's Place of Business - any or all of the following locations: (a) the place where the Collateral and DEALER's books and records are kept; (b) the place from which DEALER's business affairs and operations are conducted, unless otherwise disclosed in writing to LENDER by DEALER; (c) the place where DEALER's registered office is located; and (d) the address specified in Section 9.4.

1.9 Equipment - all Goods, other than inventory, of any kind and wherever located.

1.10 Floorplan Origination Fee - that non-refundable fee payable to LENDER by DEALER in the amount set forth in the Term Sheet provided to the DEALER, and subject to change from time to time by the LENDER for each Period, or portion thereof, in which an Advance for each individual item of Purchase Money Inventory is outstanding, provided that in the event no Term Sheet is requested or provided, then the Floorplan Fee shall be equal to Two Hundred Dollars ($200.00). Notwithstanding the foregoing or any provision in the Term Sheet to the contrary, LENDER reserves the right to charge a Floorplan Fee in a lower or higher amount as a condition to making

an Advance if, in its sole discretion, LENDER determines that the circumstances so warrant.

1.11 Interest - those finance charges owed by DEALER to LENDER on all outstanding Obligations, which charges shall begin to accrue, on the earlier of the date of each Advance or the date that an Obligation is incurred, compounded daily, and shall be payable at the rate and upon the terms and conditions set forth in this Note.

1.12 Late Fee - that non-refundable fee, which is payable when incurred to the LENDER by DEALER, in the amount equal to Twenty Five dollars ($25.00) for each item of Purchase Money Inventory, assessed each day, or portion thereof, that DEALER fails to repay Obligations under this Note when due as provided by this Note. DEALER agrees that this Late Fee is a reasonable estimate of LENDER's probable losses due to the delay, inconvenience, and administrative expenses associated with late payment. LENDER may also include in the Late Fee an amount equal to the lesser of $25 or the maximum amount permitted by law for each Check tendered to LENDER, by or on behalf of DEALER, that is subsequently dishonored, in addition to any charge or fee imposed by the depository institution for each returned or dishonored item and any other charges or fees permitted by law. All lates fees are to be paid when incurred, and may be processed automatically by the LENDER via ACH in it's sole discretion.

1.13 Non-Auction Purchase - a transaction other than an Approved Auction Purchase in which any Vehicle, vehicle part, or Goods of any kind, is now or hereafter acquired or refinanced by DEALER. The purchase by the DEALER and/or the Bill of Sale Date cannot be greater than One-Hundred and Twenty (120) days before the advance request.

1.14 NAP (Non-Auction Purchase) Fee - that non-refundable fee payable to LENDER by DEALER, in the amount set forth on the Term Sheet for each individual item of Purchase Money Inventory acquired by DEALER as a Non-Auction Purchase, provided that in the event no Term Sheet is requested or provided and or no NAP Fee is listed in the Term Sheet provided, then the NAP Fee shall be equal to One Hundred Dollars ($100.00). Notwithstanding the foregoing or any provision in any Term Sheet to the contrary, LENDER reserves the right to either waive or charge a NAP Fee in a higher or lower amount as a condition to making an Advance for a Non-Auction

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

Purchase if, in its sole discretion, LENDER determines that the circumstances so warrant.

1.15  Note - this Demand Promissory Note and Security Agreement.

1.16  Number of Curtailment Date Extensions - the number of times set forth on the applicable Term Sheet that the Curtailment Date may be extended for an item of Purchase Money Inventory pursuant to this Note, provided that in the event no Term Sheet is requested or provided, the Number of Curtailment Date Extensions shall be zero (0).

1.17  Floorplan Extension Fee - that non-refundable fee payable to LENDER by DEALER in the amount set forth on the provided Term Sheet, in which a Curtailment Date has been extended for an Advance for each individual item of Purchase Money Inventory, provided that in the event no Term Sheet is requested or provided, then the Floorplan Extension Fee shall be equal to Two Hundred Dollars ($200.00). Notwithstanding the foregoing or any provision in the Term Sheet to the contrary, LENDER reserves the right to charge a Floorplan Extension Fee in a lower or higher amount as a condition to making a Curtailment Date Extension if, in its sole discretion, LENDER determines that the circumstances so warrant.

1.18  Obligations - all Advances, debts, Purchase Money Inventory Obligations, liabilities, financial obligations, charges, expenses, fees, interest, premium, attorney fees, costs of collection, covenants, and duties and any other amounts owing, arising, due, or payable from DEALER to LENDER of any kind or nature, present or future, under any instrument, guaranty, or other document whether arising under this Note or any other agreement, whether direct or indirect (including those acquired by assignment), absolute or contingent, primary or secondary, due or become due, now existing or hereafter arising and however acquired including, without limitation, all Interest, Floorplan Fee(s) and Late Fee(s), and other expenses, costs or fees provided for herein, and all post-filing and post-petition interest and all such other amounts which would become due but for the operation of the automatic stay under Sections 362(a), 502(b) and 506(B) of the United States Bankruptcy Code.

1.19  Odometer Disclosure Statement - that statement of mileage for a Vehicle required, by the Motor Vehicle Information and Cost Savings Act as amended (49 U.S.C. § 32701 et seq.) and the regulations implementing same (49 C.F.R. § 580 et seq.), to be provided to a Vehicle transferee by the transferor.

1.20  Period - that number of days set forth on the provided Term Sheet, beginning on the earlier of the date of a requested Advance or the date that an Obligation is incurred and ending on the Curtailment Date that an item of Purchase Money Inventory will be financed by LENDER pursuant to this Note, provided that in the event no Term Sheet is requested or provided, then the Period shall be thirty (30) days.

1.21  Purchase Money Inventory - any and all Vehicles, vehicle parts, or Goods of any kind, now or hereafter acquired by DEALER with an Advance.

1.22  Purchase Money Inventory Obligations - the liabilities owing, arising, due, or payable from DEALER to LENDER with respect to specific Advances for specific items of Purchase Money Inventory now existing or hereafter arising.

1.23  Payoff Balance – The sum total of all Purchase Money Inventory Obligations, including Current Principal Balances, Fees, Late Fees, Interest and Fees charged to the DEALER's Dealer Billing Account.

1.24  Dealer Billing Account – From time to time fees and/or expenses may be incurred by the DEALER or on behalf of the DEALER in accordance with the Terms and Conditions of this Note, and these charges may not be associated with a specific Vehicle or Purchase Money Inventory. Charges such as but not limited to Lot Audit Fees, Title Fees, or miscellaneous delivery fees will be applied to the Dealer Billing Account. At the sole discretion of the LENDER, the Dealer Billing Account will be paid off in full at any occurrence of a Purchase Money Inventory Payoff event per Section 2.6. Interest is not charged on the Dealer Billing Account.

1.25  Retail Installment Contract - that contract of sale and security agreement, whether or not constituting chattel paper under Article 9 of the UCC, whereby DEALER sells Purchase Money Inventory to a retail customer in the ordinary course of DEALER's business.

1.26  Term Sheets - that schedule or schedules in effect from time to time, provided to DEALER at any time upon request from the LENDER containing information including but not limited to the Floorplan Fee, Interest, Period, Payments, and Curtailments that apply. At the sole discretion of the LENDER, multiple Term Sheets may be available and all Term Sheets are subject to change at any time by the LENDER without notice to the DEALER.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

1.27 Title - the certificate of title or other document issued by a duly authorized state, province or government agency evidencing ownership of a Vehicle.

1.28 UCC - the Uniform Commercial Code as enacted in Texas and amended from time to time. Any term used in the UCC and not defined herein has the meaning given to the term in the UCC as presently enacted in Texas or modified hereafter.

1.29 Vehicle - a vehicle, the ownership of which is embodied in a Title, driven or drawn by mechanical power, manufactured primarily for use on the public streets, roads, and highways.

1.30 Terms and Conditions - All provisions of this Note, excluding any language specifically referencing DEALER by individual or business name or address, or referencing the dollar amount of DEALER's Aggregate Advance Limit.

1.31 Line Overage Fee - that non-refundable fee payable to LENDER by DEALER, in the amount equal to One-Hundred dollars ($100.00) for each advance of an item of Purchase Money Inventory that exceeds at the time of the request the DEALER's Available Credit under this under this Note. DEALER agrees that this Line Overage Fee is a reasonable estimate of LENDER's probable administrative expenses.

1.32 Document Fee - that non-refundable fee payable to LENDER by DEALER, in the amount equal to Forty dollars ($40.00) DEALER agrees that this Document Fee is a reasonable estimate of LENDER's probable document administrative expenses. This fee may be waived at the sole discretion of the LENDER.

1.33 Curtailment – that payment applied to the Principal Balance of specific Purchase Money Inventory Obligations by the DEALER to the LENDER.

1.34 Payment – that payment applied first to Late Fees, then to Fees, then to Interest and then to the Principal Balance of specific Purchase Money Inventory Obligations by the DEALER to the LENDER.

1.35 Refloors – At the sole discretion of the LENDER, the payoff balance of an individual unit may be refloored at or before the due date of the original advance at the instruction the DEALER, constituting a new floorplan advance, in an amount no greater than (90%) of the Current Payoff, not to exceed Average Blackbook Wholesale valuation. It is the DEALER's obligation to notify LENDER to perform a refloor transaction; LENDER has no obligation or duty to perform a refloor

without notification from the DEALER. Contractually late Purchase Money Inventory may not be refloored. A paydown of the original Payoff balance may be required at the discretion of and in an amount determined by the LENDER. No more than one Refloor transaction is permitted per Bill of Sale. Refloors are not permitted on accounts with a Bill of Sale date older than 211 days. At the sole discretion of the LENDER, refloors on accounts with a Bill of Sale date older than 121 days may require an additional paydown in an amount determined by the LENDER, or the Purchase Money Inventory may not qualify for a refloor transaction.

1.36 Refloor Fee - that non-refundable fee payable to LENDER by DEALER, in the amount set forth on the Term Sheet for each individual item of Purchase Money Inventory acquired by DEALER as a Refloored Unit, provided that in the event no Term Sheet is requested or provided or no Refloor Fee is listed in the Term Sheet, then the Refloor Fee shall be equal to Fifty Dollars ($50.00) per month. Notwithstanding the foregoing or any provision in a Term Sheet to the contrary, LENDER reserves the right to either waive or charge a Refloor Fee in a lower or higher amount as a condition to making an Advance for a Refloored Unit if, in its sole discretion, LENDER determines that the circumstances so warrant.

1.37 Plan Switching – At the direction of the DEALER, the term sheet applicable to a unit may be changed to another term sheet within (30) days of the advance Origination date without an applicable fee. The plan may be switched after (30) days after the advance Origination date, but only at the sole discretion of the LENDER, and an additional Plan Switch Fee may be applied to the balance at the origination date of the new advance. Contractually past due Purchase Money Inventory may not be plan switched.

1.38 Plan Switch Fee - that non-refundable fee payable to LENDER by DEALER, in the amount equal to Fifty dollars ($50.00) for each advance of an item of Purchase Money Inventory that is Plan Switched after (30) days after the advance Origination date. This fee may be waived at the sole discretion of the LENDER.

1.39 Qualification Charges – At the sole discretion of the LENDER, additional charges may be incurred and applied to the Payoff balance for conditions related to the operations and creditworthiness of the DEALER that may change over time. These transactions are on a going forward basis and will not be adjusted retroactively. The fee is determined by the Risk Tier assigned to the DEALER, which may be changed without notice to the DEALER at the sole discretion of the LENDER. Risk Tier

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

Assignment may also be presented in the form of a reduced Preferred Status.

1.40 Rebates - At the sole discretion of the LENDER, rebates may be applied to the DEALER's obligation reducing the Payoff balance. These transactions are on a going forward basis and will not be adjusted retroactively. The rebate is determined by the Preferred Status assigned to the DEALER, which may be changed without notice to the DEALER at the sole discretion of the LENDER.

1.41 Qualifications for Rebates and Charges – Rebates are only available to a DEALER that is in good standing with the LENDER at the time the rebate is evaluated for application to the individual Purchase Money Inventory unit account. Dealer performance based on metrics, transactions or otherwise material behavior determined at the sole discretion of the LENDER may affect dealer Risk Tier or Preferred Status.

1.42 Highline Fees – At the sole discretion of the LENDER, principal balance advances exceeding a certain amount will incur a fee. The standard Highline fee for current principal balances exceeding $25,000 and less than or equal to $30,000 at origination and extensions will be in the amount of One Hundred Dollars ($100.00). The standard Highline fee for current principal balances exceeding $30,000 and less than or equal to $35,000 at origination and extensions will be in the amount of One Hundred and Fifty Dollars ($150.00). The standard Highline fee for current principal balances exceeding $35,000 and less than or equal to $40,000 at origination and extensions will be in the amount of Two Hundred Dollars ($200.00). This fee may be waived or the amount may be increased or decreased at the sole discretion of the LENDER.

1.43 Highline Authorization Required – Purchase Money Inventory with an original advance greater than $40,000 requires pre-authorization and approval from the LENDER. Purchase Money Inventory with an original advance greater than $40,000 require pre-authorization and approval from the LENDER and a paydown from the DEALER as to result in a current principal balance less than or equal to $40,000.

1.44 Highline Fee Evaluation - Balances are evaluated for highline condition and applicable fee three (3) days after the incurring of origination and extension fees.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

2.0   FINANCING PROCEDURES.

2.1   Discretionary Advances. LENDER may, in its sole discretion, from time to time, make an Advance to or on behalf of DEALER for the purpose of enabling DEALER to purchase and/or hold Purchase Money Inventory for resale, and for other purposes as determined in LENDER'S sole discretion. DEALER acknowledges and agrees that, notwithstanding anything in this Note to the contrary, LENDER may, with or without cause, in its sole discretion refuse to make an Advance. DEALER further agrees that LENDER's decision to make an Advance shall be binding only if it is in writing and signed by LENDER. DEALER and LENDER agree that DEALER is not obligated to finance any Purchase Money Inventory, or any other assets through LENDER.

2.2   Advance Requests: Purchase Money Inventory. DEALER may request an Advance for the purpose of enabling DEALER to purchase and hold an item of Purchase Money Inventory for resale by providing LENDER with: (a) a copy of the Bill of Sale which indicates the vendor and the actual purchase price of the Purchase Money Inventory; (b) as to Vehicles, a completed Odometer Disclosure Statement and the Title duly assigned to DEALER.

2.3   Advance Requests: Other Purposes. DEALER may request an Advance for purposes other than enabling DEALER to purchase and hold an item of Purchase Money Inventory for resale by providing LENDER with: (a) a written request setting forth the purpose for the requested Advance, and (b) such other information as LENDER may require. If LENDER elects to make any such Advance in its sole discretion, the Advance shall be deemed an additional Obligation under this Note from the date on which the Advance is made.

2.4   Conditions to Advances. As a condition precedent to an Advance, DEALER shall deliver to LENDER, at LENDER's request, a certificate in a form acceptable to LENDER certifying that (a) no Event of Default has occurred or is continuing, (b) DEALER is in complete compliance with the terms and conditions of this Note, (c) all prior Advances made for the purpose of enabling DEALER to purchase an Item of Purchase Money Inventory have only been used to purchase Vehicles encumbered by this Note, (d) no material adverse effect to the business, properties, operation, condition or prospects of DEALER (financial, business, labor or otherwise) exists or is threatened, (e) no checks issued by DEALER to LENDER have been dishonored, and (f) such other information as LENDER may request. In addition, if the Advance request is for the purpose of enabling DEALER to purchase and hold an item of Purchase Money Inventory for resale, DEALER shall deliver to LENDER, at LENDER's request, a certificate in a form acceptable to LENDER, certifying that the Advance will be used only to purchase Vehicles encumbered by this Note. Notwithstanding the foregoing, the parties acknowledge that, consistent with Section 2.1, nothing in this Section or elsewhere in this Note shall be construed to require LENDER to make Advances except in its sole discretion.

2.5   Advances Without Request. If at any time including but without limitation during an Event of Default or acceleration under this Agreement, DEALER is in default on any obligation to a third party, LENDER may in its sole discretion elect, but is not required, to make payment or transfer on DEALER's behalf to the third party, in any amount up to the total obligation owed by DEALER to the third party, as a means of satisfying DEALER's obligation to the third party in whole or in part. If LENDER elects to make any such payments or transfers, they shall be deemed additional Obligations under this Note from the date on which the payment or transfer is made. Such payments or transfers may be made without prior notice to DEALER and without regard to any Aggregate Advance Limit then in effect for DEALER.

2.6   Repayment of Purchase Money Inventory Obligations and Obligations. DEALER shall pay to LENDER at the offices of LENDER (or at such other location as directed by LENDER to DEALER in writing) the Purchase Money Inventory Obligations and the other Obligations, on demand and without notice. With respect to an item of Purchase Money Inventory, DEALER shall repay LENDER the related Purchase Money Inventory Obligations and all related Obligations on the earliest of: (a) forty-eight (48) hours after the disposition by sale or otherwise of an item of Purchase Money Inventory; (b) the Curtailment Date; or (c) the damage or destruction of such Purchase Money Inventory. LENDER shall be entitled to apply applicable payments to the Purchase Money Inventory Obligation Incurred from said item of Purchase Money Inventory. Notwithstanding anything herein to the contrary including Sections 3.0 and 4.0 if, after the disposition by sale or otherwise and subsequent payment to LENDER as delineated above, a shortage exists between any payments received by LENDER and the Purchase Money Inventory Obligation with respect to an item of Purchase Money Inventory, that shortage shall be considered an Obligation owed by DEALER to LENDER and secured with Collateral other than Purchase Money Inventory. Any order and method of application of payments of the Obligations, excluding payments with respect to Purchase Money Inventory Obligations, shall be at the sole discretion of LENDER. DEALER irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by LENDER, and DEALER irrevocably agrees that LENDER shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter against the Obligations in such manner and in such order as LENDER deems advisable in its sole discretion. Notwithstanding anything herein to the contrary, LENDER reserves the right to require that all

Page 6 of 19

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

payments be made via ACH, and DEALER shall execute an ACH payment authorization upon request.

2.7 <u>Extension of Curtailment Date</u>. If DEALER is in compliance with all other provisions of this Note, LENDER may, in its sole discretion, permit an extension of the Curtailment Date relative to an item of Purchase Money Inventory for a Period, upon the payment of Interest, Floorplan Fee(s) and outstanding Principal relating to such item of Purchase Money Inventory, as required in the applicable Term Sheet.

2.8 <u>Presumptions Regarding Outstanding Balance</u>. The date and amount of each Advance made by LENDER and of each repayment of principal or interest thereon shall be recorded by LENDER. The aggregate unpaid principal amount, interest, fees, and other Obligations so recorded by LENDER shall constitute conclusive evidence (absent manifest error) of the sums owing and unpaid under this Note; provided, however, that the failure by LENDER to so record any such amount or any error in so recording any such amount shall not limit or otherwise affect the amount of the Obligations or the liability of DEALER under this Note to repay the Obligations.

2.9 <u>Purchase Money Inventory and Title Control</u>. At any and all reasonable times DEALER shall allow LENDER's officers, employees, agents, attorneys, designees and representatives access to DEALER's books and records (including, without limitation, Titles to Vehicles and invoices for such Vehicles and all orders, receipts, correspondence and other data relating to the Collateral) and property and the DEALER's Place of Business for the purpose of conducting an audit of DEALER's property, books and records. DEALER agrees to pay all of LENDER's expenses in conducting such audit. DEALER may request the Title to a Vehicle or Vehicles held by LENDER for purposes of correcting same or taking said Vehicle(s) to an auction. If LENDER in its sole discretion agrees with such request, DEALER shall deliver to LENDER a Check or draft in an amount equal to such Advance(s) relating to such Vehicle(s). Unless such Title(s) are returned to LENDER within the time period established by LENDER, (a) LENDER may (i) deposit or present such check or draft for payment or (ii) process such payment via ACH and return the Check to DEALER, and (b) any outstanding Obligation(s), Floorplan Fee(s) or accrued interest relating to Advance(s) for such Vehicle(s) shall become immediately due and payable. DEALER shall not apply for a duplicate or replacement Title with respect to any Vehicle or take any action which is inconsistent with LENDER's interest in the Collateral.

2.10 <u>Electronic Auditing</u>. The LENDER reserves the right to utilize electronic devices, mobile applications and/or other methods of remote data collection for the verification of vehicle identification, vehicle condition, location and/or other information as required by LENDER to adequately and effectively audit Purchase Money Inventory. Methods may require the cooperation and/or participation of the DEALER and may require the use of the DEALER's mobile device. The DEALER is expected to perform these procedures in a timely manner. The DEALER may be provided with a dedicated device to facilitate on-site auditing by the LENDER. If provided a device, the DEALER is expected to exercise reasonable care when handling and using the device. The LENDER may or may not require a device deposit, and may or may not charge a fee for providing or replacing the device. At the sole discretion of the LENDER, the DEALER may or may not be compensated for performing these auditing procedures as required by the LENDER. The LENDER reserves the right to request audits be performed on a regular scheduled basis, random basis, event triggered basis, whole inventory or partial inventory basis and/or software triggered basis. The request for audit may be verbal, electronic, in writing, on the DEALER Portal, via e-mail, and/or via any other method deemed appropriate by the LENDER. A whole inventory audit basis would include all vehicles on the DEALER's lot, including vehicles owned outright by the DEALER and other inventory financing facilities.

2.11 <u>Authorization of LENDER</u>. By execution of this Note, DEALER authorizes LENDER and any of its officers or employees to take any and all action to secure and perfect its interest in the Collateral including but not limited to taking possession of the Collateral and executing and filing, on behalf of DEALER and without DEALER's signature, original financing statements, amendments, continuation statements, and any other documents LENDER deems necessary or desirable to protect its interests. DEALER authorizes LENDER to supply any omitted information and correct errors in any document executed by or on behalf of DEALER, and to contact any bank or other depository institution to obtain account information concerning DEALER. DEALER authorizes LENDER to obtain credit information from a credit bureau, and any financial institutions or trade creditor that DEALER has provided as well as other credit investigation that LENDER in LENDER's sole discretion deems necessary for purposes of including, but not limited to assessing my credit worthiness, collection of any outstanding debt, and obtaining intercreditor agreements and perfecting LENDER's security interest (hereinafter collectively referred to as "Credit Screening"). DEALER also authorizes LENDER to contact any third parties to disclose information, including information contained in this Note, for the purposes of Credit Screening. DEALER also authorizes LENDER to disclose the above described information to any of its affiliates, subsidiaries, and parent companies. Further, DEALER authorizes LENDER to review DEALER's account periodically, which could include obtaining additional credit reports for the purpose of Credit Screening. DEALER authorizes LENDER to disclose my credit information into any credit database. In addition, DEALER shall execute the Power of Attorney incorporated herein by reference as Exhibit A.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

3.0 **GRANT OF SECURITY INTEREST.** To secure DEALER's prompt payment of the Purchase Money Inventory Obligations, DEALER hereby grants to LENDER a lien and a purchase money security interest in the Purchase Money Inventory and the Titles thereto. To secure DEALER's prompt payment of the Obligations, DEALER hereby grants to LENDER a lien and security interest in all of the Collateral except the Purchase Money Inventory. DEALER understands and agrees that LENDER at all times intends to maintain the status of a Purchase Money Secured Creditor with priority rights in the Purchase Money Inventory as provided under the UCC. Therefore, to the extent purchase money status would not be invalidated or become unperfected (and can still be maintained under applicable law), DEALER also grants LENDER a lien and a security interest: (a) in all Purchase Money Inventory in order to secure all Obligations that are not Purchase Money Inventory Obligations, and (b) in all Collateral that is not Purchase Money Inventory in order to secure Purchase Money Inventory Obligations.

4.0 **SALES OF PURCHASE MONEY INVENTORY.** DEALER may not sell or transfer any Purchase Money Inventory or other Collateral without the written consent of LENDER; provided, however, that unless and until an Event of Default shall have occurred, DEALER may sell Purchase Money Inventory to bona fide buyers in the ordinary and regular course of DEALER's business, but nothing herein shall be deemed to waive or release any Interest LENDER may have hereunder or under any other agreement in any proceeds or replacements of the Purchase Money Inventory. Upon the sale of any item of Purchase Money Inventory, DEALER shall hold the amount received from the disposition of Inventory in Trust for the benefit of LENDER and DEALER shall pay to LENDER, in accordance with Section 2.6, an amount equal to the unpaid balance of the Purchase Money Inventory Obligations and Obligations relating to such Purchase Money Inventory.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

5.0 **DEALER'S COVENANTS.** Until the indefeasible payment in full in cash of all of the Obligations or unless LENDER shall otherwise consent in writing, each individual undersigned DEALER covenants and agrees as set forth in Sections 5.1 through 5.14 below.

5.1 **Disposition of Purchase Money Inventory.** Unless Purchase Money Inventory is the subject of a Retail Installment Contract that satisfies the requirements of Section 6.7 or is sold pursuant to Section 4.0, DEALER shall not attempt to or actually, sell, lease, transfer, mortgage, encumber, or otherwise dispose of the Purchase Money Inventory, any part thereof, or any interest therein, or remove, for a period exceeding twenty-four (24) hours, any item of Purchase Money Inventory from the DEALER's Place of Business. In addition, DEALER shall keep the Purchase Money Inventory free from any lien, security interest, mortgage, claim, charge or other encumbrance, other than those granted pursuant to this Note or permitted in writing by LENDER.

5.2 **Unconditional Payment Obligation.** DEALER's obligation to make full payment under this Note is unconditional and shall not be affected by claim or disputes DEALER may have against any other person, including but not limited to claims or disputes DEALER may have against any person or entity who transferred, conveyed, or sold one or more Vehicles to DEALER.

5.3 **Maintenance of Collateral.** DEALER shall keep and maintain the Purchase Money Inventory in good repair and safe Debtor condition, and not cannibalize, alter or substantially modify the Collateral, nor secrete or conceal the Collateral. Without limiting the foregoing, DEALER shall have the Purchase Money Inventory serviced with all appropriate factory recalls and all other required maintenance and shall not permit mechanics liens to attach thereto.

5.4 **DEALER's Books and Records; Reports.** DEALER has kept and shall continue to keep true, accurate and complete books and records concerning its business affairs (including records of inventory sales) and the Collateral. Such books and records shall contain full and correct entries of all business transactions and shall be kept in accordance with Generally Accepted Accounting Principles (GAAP) consistently applied. DEALER shall at least annually (but in no event later than within 120 days after the end of each fiscal year) and upon request furnish financial statements (including reasonably detailed statements of profit and loss, balance sheets and other information as required by LENDER, in such form as required by LENDER) to LENDER based upon said books and records and upon request shall permit LENDER to inspect, make extracts from and receive from DEALER originals or true copies of DEALER's books and records and any papers relating to the Collateral. Should the LENDER request, DEALER shall at least monthly (but in no event later than ten days after the end of each month)

provide LENDER with copies of all its bank account statements and summaries of its monthly inventory sales in form satisfactory to LENDER. All financial statements submitted to LENDER shall fairly present the financial condition of DEALER and any other person or entity identified in such financial statements as of the preparation date. DEALER shall notify LENDER, in writing, of (a) any material adverse change in the financial condition of DEALER as compared to any prior financial statements submitted to LENDER; (b) the occurrence of any Event of Default; (c) the occurrence of any loss, damage or destruction to any Purchase Money Vehicle or any event giving rise to a claim of insurance; (d) any event of material loss of depreciation in the value of Purchase Money Inventory and the amount of such loss; and (e) all cases involving the return, rejection, revocation, acceptance, repossession, damage or loss of or to Purchase Money Inventory sold or transferred or otherwise disposed.

5.5 **Insurance.** DEALER shall keep the Collateral insured against such risks and in an amount equal to greater of $1,000,000 or the Aggregate Advance Limit (or such lesser amount as LENDER may from time to time permit) and with such insurer or insurers as LENDER may from time to time approve. DEALER shall provide LENDER, or LENDER's designees, with copies of its policies of insurance covering the Collateral together with evidence that the premium therefor has been paid and that LENDER has been named as loss payee or additional Insured on such policies. The proceeds of loss under such policies are hereby assigned to LENDER and any proceeds under such policies with respect to any Purchase Money Inventory shall if not received by LENDER be held in trust for the benefit of LENDER and shall be forthwith paid over to LENDER and shall, at LENDER's sole discretion be immediately applied to prepay or repay the related Purchase Money Inventory Obligations and related Obligations and, if LENDER so elects, any other Obligations. If LENDER determines, in its sole discretion, that DEALER has not maintained adequate insurance coverage for the Collateral, LENDER may, but has no obligation to, purchase a policy or policies of insurance (through forced placement or otherwise) and may treat amounts so expended as additional Obligations. The risk of loss or damage to the Collateral shall at all times remain solely with DEALER. All insurance policies shall provide for at least 30 days' notice to LENDER of cancellation or change in coverage to LENDER.

5.6 **Litigation Notice.** DEALER shall provide to LENDER within five (5) days after service of process, notice of any litigation, arbitration, or other proceeding by or before any court, governmental agency, or entity affecting DEALER.

5.7 **Taxes.** DEALER has paid and shall pay all taxes and assessments relating to its business affairs and shall pay all taxes and assessments at any time levied on the Collateral as and when the same become due and payable in the

Page **9** of 19

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

ordinary course. If DEALER fails to pay taxes or assessments relating to the Collateral, LENDER may, but has no obligation to, pay said taxes or assessments and may treat amounts so expended as additional Obligations.

5.8 **Further Assurances.** DEALER shall execute any and all documents and take all other actions requested by LENDER as LENDER deems necessary or advisable to confirm an Advance or create, perfect, protect and maintain LENDER's liens and security interests in the Collateral. DEALER shall, at any time and at the request of LENDER, assign in writing any or all Retail Installment Contracts and deliver the originally executed Retail Installment Contracts to LENDER.

5.9 **Acknowledgments.** DEALER acknowledges that LENDER has relied on DEALER's Covenants and DEALER's Representations and Warranties as delineated in this Note, and is not charged with any contrary knowledge that may be ascertained by examination of the public records, or that may have been received by any officer, director, agent, employee, representative or shareholder of LENDER.

5.10 **Changes in DEALER's Business.** By the execution of this Note, DEALER hereby represents that the place of business stated in this document is true and correct. DEALER shall provide LENDER with 30 days' prior written notice of any of the following (and will not, in the case of clauses (b), (c), (e), (f) or (h), take any actions described therein without the written consent of LENDER): (a) any change in DEALER's Place of Business or Chief Executive Officer, President, Managing Partner, or primary managing officer of the business, (b) any change in the corporate, business or ownership structure of DEALER, (c) any change in the state or jurisdiction of incorporation, organization or business entity registration of DEALER, (d) any change in the legal name or trade name of DEALER, (e) any consolidation or merger with any other person or entity, (f) any change in control of DEALER, (g) any sale, transfer or insurance of equity securities or reclassification, readjustment or other change in capital structure, or (h) any amendment to DEALER's articles, by-laws or other organizational documents.

5.11 **Account Debtors.** DEALER shall, at any time and at the request of LENDER, notify any or all account debtors or obligors that LENDER has the right to enforce DEALER's rights against the account debtors or obligors, that LENDER has a security interest in the accounts and chattel paper, and that the account debtors and obligors must direct payment to LENDER.

5.12 **Guaranties.** At the request of LENDER prior to the execution of this Note and at any time thereafter, DEALER shall deliver to LENDER a duly executed guaranty or guaranties of a party or parties which is incorporated herein by reference as Exhibit B.

5.13 **Control Agreements.** DEALER shall deliver or cause to be delivered to LENDER control agreements or similar type agreements in form and substance satisfactory to LENDER with respect to Collateral consisting of deposit accounts, certificates of deposit, investment property, letter of credit rights and electronic chattel paper, certified or uncertified securities, and other collateral which may require steps in addition to filing a financing statement to perfect LENDER'S security interest. In the event satisfactory control agreements cannot be obtained to LENDER's satisfaction, DEALER shall cause the account or other property to be placed in LENDER's name as owner or co-owner.

5.14 **Other Financing.** Except with the written consent of LENDER, DEALER will not incur any other financing or incur any other indebtedness, nor guarantee or otherwise become liable for the obligations of others.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

6.0   **DEALER'S REPRESENTATIONS AND WARRANTIES.**

6.1   On the date of this Note and until the Obligations are indefeasibly paid in full in cash and DEALER has performed all of its obligations hereunder, DEALER represents, warrants and covenants that all representations and warranties contained in this Note and every factual matter in any other document delivered to LENDER by or on behalf of each individual undersigned DEALER shall at all times are and shall be true and correct in all material respects for each undersigned DEALER and will remain true and correct at all times (including upon the making of each Advance) for each undersigned DEALER.

6.2   Permits and Licenses. DEALER has all applicable permits and licenses necessary to conduct business as a retail or wholesale seller, as applicable, of the Collateral. DEALER has all required government certificates, licenses, registrations, and charters to operate as the entity or business type identified and is in good standing with all applicable governmental authorities. DEALER shall comply with, and not permit any violation by its agents or employees of, all applicable laws, regulations, and orders of public authorities relating to DEALER's business affairs and the Collateral.

6.3   Authority. The undersigned is legally competent (in the case of a person) or is duly formed, validly existing and in good standing in its state of formation or the states in which it does business (in the case of an entity), and has been duly authorized by all necessary action, to execute and deliver this Note and consummate all of the transactions contemplated hereby. DEALER has now and will have at the time of each Advance full right, power, and authority to borrow in the manner and on the terms and conditions set out in this Note, and to grant LENDER the lien and security interest granted in this Note without the consent or approval of any third party or public authority. The execution, delivery and performance of this Note does not breach or contravene the provisions of any organizational document or contract, agreement or law (which, for purposes of this Note, also includes any order, rule, regulation or decree by any court or governmental authority) binding on DEALER.

6.4   Ownership. DEALER has now and will have at the time of each Advance good and marketable title to the Purchase Money Inventory and has now and will have good and marketable or leasehold title to all of its other properties and assets, in each case free and clear of all liens, security interests, mortgages, charges, claims, and other encumbrances or interests whatsoever, except the lien and security interest granted under this Note, or except as permitted by LENDER in writing or acknowledged by LENDER's written notification to such third party advising such third party of LENDER's purchase money

security interest in the Purchase Money Inventory and the proceeds thereof.

6.5   Enforceability. This Note, and any other agreements or documents contemplated herein or executed in connection herewith, constitute valid and binding obligations of the DEALER and all are enforceable against DEALER in accordance with their respective terms.

6.6   Litigation. No legal, arbitration, or administrative proceedings are pending or threatened against DEALER which could reasonably affect the Collateral or which materially and adversely affect the properties, business, prospects, or condition, financial or otherwise, of the DEALER or DEALER's ability to honor its obligations hereunder.

6.7   Check Representations. With each and every payment to LENDER by Check, DEALER represents and warrants (regardless of whether DEALER is the drawer of the Check), that, at the time of issuance of the Check and at the time such Check may be presented for payment, the account upon which such Check is drawn contains immediately available funds sufficient for payment of that Check and all other Checks issued or outstanding at that time.

6.8   Retail Installment Contract Representations. With respect to each Retail Installment Contract: (a) DEALER is the owner thereof; (b) DEALER has made all filings, recordation's, and has taken all necessary actions (including registration on a certificate of title) which are required to perfect DEALER's interest with respect to the Collateral therein; (c) such Retail Installment Contract is the result of a bona fide transaction entered into in the ordinary course of DEALER's operations; (d) such Retail Installment Contract is true, valid, genuine, binding, and enforceable in accordance with the written terms thereof, (e) such Retail Installment Contract is the only chattel paper with respect to the subject thereof, (f) such Retail Installment Contract is and will continue to be free from all defenses, setoffs, and counterclaims of any kind; (g) such Retail Installment Contract conforms with all applicable laws; (h) except as to any interest disclosed in writing to LENDER, such Retail Installment Contract is free from all security, liens, and/or encumbrances; and (i) the property which is the subject of the Retail Installment Contract has been delivered to the retail purchaser under such Retail Installment Contract.

6.9   Lot Representation. All Vehicles located at DEALER's place of business constitute inventory for resale in the ordinary course of DEALER's business unless the Vehicle is plainly marked otherwise. None of the Vehicles are in DEALER's possession pursuant to a consignment or other agreement providing that someone other than DEALER is the Vehicle's owner or has rights in the Vehicle superior to the rights of DEALER or LENDER, unless (a) LENDER has been notified in writing that such Vehicles

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

are in DEALER's possession and (b) the Vehicles are plainly so marked and identified.

6.10 Name of DEALER. DEALER's legal name is precisely the name set forth as such on the last page of this Note, Section 0.

6.11 State of Organization. DEALER's state of incorporation, organization or other business entity registration is the state or jurisdiction set forth as such on the last page of this Note. Upon request, DEALER shall furnish to LENDER an official certificate from the appropriate governing authority evidencing the current legal status of DEALER's business organization.

6.12 Business Use. The Purchase Money Inventory is bought or used primarily for business use, including resale to others in the ordinary course of business.

6.13 True and Accurate Information. All information, financial statements, books, records and data heretofore or hereafter furnished by DEALER to LENDER are or will be true and accurate in all material respects. All financial statements heretofore or hereafter provided shall fairly present the financial condition of DEALER and the results of DEALER's operations at the times and for the periods therein stated, and shall be prepared in accordance with generally accepted accounting principles.

7.0 EVENT OF DEFAULT. Each and every one of the following events in Sections 7.1 through 7.12 shall be considered an Event of Default:

7.1 The default in any payment or repayment when due of any of the Purchase Money Inventory Obligations or Obligations, as provided in the Note;

7.2 LENDER's deeming itself insecure regarding the Collateral or the possibility of DEALER's default in any payment or repayment of any of the Obligations;

7.3 LENDER's determination, or receipt of any evidence indicating or claiming, that LENDER's liens and security interests granted hereunder is invalid or is not prior to all other liens, security interests, mortgages, charges, claims, encumbrances or interests of any kind in the Purchase Money Inventory, except as expressly permitted by LENDER in writing or acknowledged by LENDER'S written notification to such third party advising such third party of LENDER's purchase money security interest in the Purchase Money Inventory and the proceeds thereof;

7.4 The default in payment or performance of any debt or obligation of DEALER or any guarantor of the Note whether to LENDER or to a third party;

7.5 LENDER determining, in its sole discretion, that any covenant, warranty, representation, or statement made by DEALER or any guarantor of the Note in connection with this Note or such guaranty, related documents, any Advance or otherwise to or for the benefit of LENDER has been breached or is false or misleading;

7.6 The loss, theft, damage, destruction, sale (except as permitted by Section 4.0), or encumbrance of the Collateral, or the making of any levy, seizure, attachment, or execution against DEALER or any of its property;

7.7 The inability of DEALER or any guarantor to pay debts as they mature, insolvency of DEALER or any guarantor, appointment of a receiver, liquidator, custodian or trustee for DEALER or any guarantor, assignment for the benefit of creditors by DEALER or any guarantor, commencement of any proceeding under any bankruptcy or insolvency law by or against DEALER or any guarantor of the Note, or entry of or issuance of any order of attachment, execution, sequestration, or other order in the nature of a writ is levied upon the Collateral;

7.8 The death or incompetency of DEALER if DEALER is an individual or any guarantor, or the death, incompetency, or

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

resignation of a principal stockholder, officer, or manager of DEALER or any guarantor;

7.9 Dissolution, liquidation, merger or consolidation, or transfer of any substantial part of the property of DEALER or of any guarantor; or

7.10 LENDER determining in its sole discretion that a material adverse change has occurred in the business, assets, condition (financial or otherwise), operations, performance, properties or prospects of DEALER or any guarantor of the Note; or

7.11 LENDER determining, in its sole discretion, that control contests or other management disputes within or regarding the DEALER threaten or may threaten the timely repayment of the Obligations by DEALER.

7.12 An Event of Default by any one undersigned DEALER shall be deemed an Event of Default by all the undersigned DEALERS.

7.13 LENDER in their sole discretion reserves the right but not the obligation to accept partial payments on a regular or irregular schedule in order to satisfy any or all outstanding DEALER obligations.

8.0 **REMEDIES.**

8.1 Whenever an Event of Default shall exist, or at any time thereafter (such a default not having previously been cured), LENDER, at its option and without demand or notice of any kind, may declare the Obligations (including the Purchase Money Inventory Obligations) to be immediately due and payable; provided that if an Event of Default described in Section 7.7 has occurred, the Obligations (including the Purchase Money Inventory Obligations) shall automatically be immediately due and payable without any act of, or delivery of notice by or to, LENDER, DEALER or any other person or entity. Upon such Event of Default, LENDER shall have the rights and remedies of a secured party under the UCC with respect to the Collateral, and any other rights or remedies at law, in equity by agreement or otherwise. LENDER shall have the right to pursue any of its rights and remedies separately, successively or concurrently, and the exercise of any right or remedy shall not preclude its subsequent exercise at a later time or the exercise of other rights or remedies. Without limiting the foregoing, LENDER may (a) notify any or all creditors, account debtors or obligors of DEALER's default or of the security interest of LENDER in DEALER's accounts or chattel paper and direct payment of same to LENDER; (b) demand, receive, sue for and give receipts or acquittances for any moneys due or to become due on any account receivable, Retail Installment Contract, or under any chattel paper or endorse any item representing any payment on or proceeds of the Collateral; (c) assent to any or all extensions or postponements of time of payment or any other indulgence in release of the Collateral, to the addition or release of acceptance of partial payments and the settlement, compromise or adjustment of such claims, all in a manner and at times as LENDER shall deem advisable; (d) execute and deliver for value all necessary or appropriate bills of sale, documents of title, and other documents and instruments in connection with the management or disposition of the Collateral or any part thereof, (e) hold, store, keep idle, lease, operate, remove, or otherwise use or permit the use of the Collateral or any part of it, for that time and upon those terms as LENDER, in its sole discretion, deems it to be in its own best interests; (f) take possession of the Collateral; and (g) without notice except as specified hereunder or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of LENDER's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as LENDER may deem commercially reasonable. For all such purposes, LENDER may, without prior notice, enter upon the premises (with or without judicial process) on which the Collateral is situated (or is believed to be situated) and either cause the Collateral to remain on, be stored on, or managed at such premises at DEALER's expense, pending sale or other disposition of the Collateral or remove the Collateral to

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

such other place as LENDER shall determine. Notwithstanding the foregoing rights, DEALER shall, upon LENDER's demand, assemble the Collateral and make the Collateral available to LENDER at a place to be designated by LENDER. DEALER hereby consents to the appointment of a receiver by any court of competent jurisdiction without necessity of notice, hearing or bond.

8.2    <u>Procedures</u>. LENDER may comply with any provision of this Note and any applicable state or federal law requirements in connection with a disposition of the Collateral, and compliance will not be considered adversely to affect the commercial reasonableness of any sale of Collateral. LENDER may sell Collateral without giving any warranties and may specifically disclaim warranties, including warranties of title and the like. LENDER shall not be liable or accountable for the failure to seize, collect, realize, sell, or obtain possession or payment of all or any part of the Collateral and shall not be bound to institute proceedings for the purpose of seizing, collecting, realizing, selling or obtaining possession or payment of same or for the purpose of preserving any rights of LENDER, DEALER or any other person. LENDER shall not have any obligation to take any steps to preserve rights against prior parties to any Collateral, whether or not in LENDER's possession, and shall not be liable for failure to do so.

8.3    <u>No Obligation to Pursue Others</u>. LENDER shall have no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them, and LENDER may release, modify or waive any Collateral provided by any other person to secure any of the Obligations, all without affecting LENDER's rights against DEALER. DEALER waives any right it may have to require LENDER to pursue any third person for any of the Obligations.

8.4    <u>Sales on Credit</u>. If LENDER sells any of the Collateral on credit, DEALER will be credited only with payments actually made by the purchaser, received by LENDER and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, LENDER may resell the Collateral and DEALER shall be credited with the proceeds of the sale.

8.5    <u>Notice of Sale</u>. DEALER agrees that motor vehicles are a type of collateral customarily sold on a recognized market and that LENDER therefore has no obligation to notify DEALER, or any other person, prior to their sale. In the event LENDER does send notice prior to sale of any Collateral, DEALER agrees that the sending of notice, whether delivered personally, by courier service or by certified or registered mail to any address of DEALER set forth in this Note, of the time and place of any public sale or the time after which any private sale or other intended disposition is to be made, shall be deemed reasonable notice thereof. LENDER may, without further notice or publication, adjourn any public or private sale or cause the

same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place at which it was announced at the sale so adjourned.

8.6    <u>Action Against Bond</u>. To the extent not prohibited by law, DEALER authorizes LENDER to proceed in an action to collect on or against any bond posted by DEALER with any state or local authorities.

8.7    <u>No Marshaling</u>. LENDER shall have no obligation to marshal any assets in favor of DEALER, or against or in payment of the Note, any Obligations or any other obligation owed to LENDER by DEALER or any other person.

8.8    <u>Right of Offset</u>. Upon the occurrence and during the continuance of an Event of Default, LENDER is authorized at any time and from time to time, without notice to DEALER, to offset directly or through any of LENDER's affiliates, any and all deposits (whether general or special, time or demand, provisional or final, or otherwise) and other assets and properties at any time held in the possession, custody or control of LENDER or its affiliates, and any indebtedness at any time owing by LENDER or its affiliates to or for the credit, account or benefit of DEALER, against any and all of DEALER's Obligations.

8.9    <u>Injunctive Relief</u>. DEALER recognizes that if an Event of Default occurs, no remedy of law will provide adequate relief to LENDER, and therefore, DEALER agrees that LENDER shall be entitled to temporary and permanent injunctive relief if an Event of Default has occurred without the necessity of proving actual damages.

8.10    <u>Cumulative Rights</u>. All of LENDER's rights and remedies contained herein or in any guaranty hereof or other related document are cumulative and non-exclusive and shall be in addition to any rights provided to it under applicable law.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

### 9.0  GENERAL.

9.1  Indemnification. DEALER hereby indemnifies and holds LENDER and its successors or assigns, affiliates and their respective directors, managers, members, partners, officers, employees, agents, advisors, subsidiaries, representatives, successors, assigns and controlling persons (each, an "Indemnified Person") harmless from and against any and all liabilities, loss, damage, costs, or expenses of whatever kind or nature relating to, arising out of or in any way connected to this Note, any guaranty hereof, any documents and instruments related to any of the foregoing, any transactions contemplated hereby or thereby, or DEALER's business affairs including, without limitation, attorneys' fees and expenses incurred both in the defense of any action against any Indemnified Person and in any action to enforce these indemnity rights as against the DEALER. IT BEING UNDERSTOOD THAT IT IS THE INTENTION OF THE PARTIES HERETO THAT EACH INDEMNIFIED PERSON IS INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE, REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL.

9.2  No Partnership; Joint Venture; DEALER's Business Affairs. Notwithstanding anything to the contrary herein contained or implied, LENDER, by this Note or by any action pursuant hereto, shall not be deemed to be a fiduciary, partner or joint venture of DEALER. DEALER furthermore agrees that notwithstanding the conditions of lending herein, the purchase or sale of Vehicles or Equipment by DEALER is in the ordinary course and, prior to an Event of Default, at the discretion and subject to the business judgment of DEALER. LENDER has no responsibility or liability of any kind with regard to the quantity, quality, condition, purchase price, or marketability of any item of Purchase Money Inventory. LENDER is not a party to any loss or gain in the sale of any Purchase Money Inventory sold by DEALER.

9.3  Expenses. DEALER agrees to pay within three days of demand all of LENDER's expenses and costs incidental to the financing provided for under this Note or otherwise incurred in connection with the negotiation, investigation, documentation, administration, maintenance and preservation, review, collection, enforcement and litigation of this Note, any guaranty hereof and the related documents, the transactions contemplated hereby and the Collateral. Such costs shall include, but are not limited to, legal fees and other fees and out-of-pocket expenses incurred by LENDER or its counsel (including paralegals and similar persons) and any filing fees, stamp taxes, insurance or other charges associated with the creation, perfection, or maintenance of the security interest granted herein. DEALER agrees that if it fails or refuses to pay any taxes or assessments relating to the Collateral or fails to maintain proper insurance coverage for the Collateral,

LENDER may, but has no obligation to, pay said taxes or assessments and purchase a policy or policies of insurance and may treat amounts so expended as additional Obligations. Any amount so paid or advanced by LENDER, plus related costs, shall be repaid by DEALER on demand and shall bear interest at the highest rate permitted by law from the date of such payment or advance.

9.4  Notices. All notices, requests, or other communications by DEALER required by, permitted under, or relating to this Note shall be in writing. Any notice shall be effective (a) if delivered personally (or by courier) with signed receipt therefor, or (b) three days after dispatch, if delivered via certified or registered U.S. Mail, postage prepaid and addressed as follows:

**If intended for LENDER**
Vehicle Acceptance Corporation
901 Main St.
Suite #3450
Dallas, Texas 75202
Attention: President

**If intended for DEALER**
RA Auto Group
6900 Gateway E Blvd.
El Paso, Texas 79915
Attn: Alexander Chavira

All such notices shall be deemed reasonably and promptly given if the effective date thereof is at least five days prior to the event with respect to which notice is given.

9.5  Merger, Modification; Headings; Waiver. This Note and the documents contemplated hereby are intended by the parties as an amendment and restatement of any prior Promissory Note and Security Agreement or agreements with regard to the subject matter hereof. Notwithstanding the foregoing, this Note and the documents contemplated hereby contain the entire agreement of the parties with regard to the subject matter hereof, and shall be binding upon and inure to the benefit of the successors and assigns of the parties; however, no obligation or rights of DEALER shall be assignable. Any request for an Advance by DEALER and subsequent Advance by LENDER pursuant to Sections 2.1, 2.2 or 2.3 shall constitute the assent of the parties to the Terms and Conditions in effect at that time. The provisions of this Note may not be altered, amended, or modified by DEALER except in a writing signed by both parties. The parties acknowledge that the headings herein are for convenience only and shall not be considered in the interpretation of this Note.

9.6  Usury. It is the intention of DEALER and LENDER to comply strictly with applicable usury laws. Accordingly, notwithstanding any provision to the contrary in this Note, or in any contract, instrument or document evidencing or securing or guaranteeing the payment hereof or otherwise

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

relating hereto, including without limitation, each guaranty of this Note and each other security agreement, pledge agreement, mortgage, deed of trust, control agreement or other security document (together with all amendments, supplements, restatements or modifications thereto and including the Note, each herein a "Loan Document"), in no event shall this Note or any Loan Document require the payment or permit the payment, taking, reserving, receiving, collection or charging of any sums constituting interest under applicable laws that exceed the maximum amount permitted by such laws, as the same may be amended or modified from time to time (the "Maximum Rate"). If any such excess interest is called for, contracted for, charged, taken, reserved or received in connection with this Note or any Loan Document, or in any communication by LENDER or any other person or entity to the Borrower or any other person or entity, or in the event that all or part of the principal or interest hereof or thereof shall be prepaid or accelerated, so that under any of such circumstances or under any other circumstance whatsoever the amount of interest contracted for, charged, taken, reserved or received on the amount of principal actually outstanding from time to time under this Note shall exceed the Maximum Rate, then in such event it is agreed that: (a) the provisions of this Section shall govern and control; (b) neither DEALER nor any other person or entity now or hereafter liable for the payment of this Note or any Loan Document shall be obligated to pay the amount of such interest to the extent it is in excess of the Maximum Rate; (c) any such excess interest which is or has been received by LENDER, notwithstanding this paragraph, shall be credited against the then unpaid principal balance hereof or thereof, or if this Note or any Loan Document has been or would be paid in full by such credit, refunded to DEALER; and (d) the provisions of this Note and each Loan Document, and any other communication to DEALER, shall immediately be deemed reformed and such excess interest reduced, without the necessity of executing any other document, to the Maximum Rate. The right to accelerate the maturity of this Note or any Loan Document does not include the right to accelerate, collect or charge unearned interest, but only such interest that has otherwise accrued as of the date of acceleration. Without limiting the foregoing, all calculations of the rate of interest contracted for, charged, taken, reserved or received in connection with this Note and any Loan Document which are made for the purpose of determining whether such rate exceeds the Maximum Rate shall be made to the extent permitted by applicable laws by amortizing, prorating, allocating and spreading during the period of the full term of this Note or such Loan Document, including all prior and subsequent renewals and extensions hereof or thereof, all interest at any time contracted for, charged, taken, reserved or received by LENDER. The terms of this paragraph shall be deemed to be incorporated into each Loan Document. For purposes of the Texas Finance Code, as it may from time to time be amended, the Maximum Rate shall be the "applicable weekly rate" referred to in and determined under Section

303.002 of the Texas Finance Code, after application of Section 303.009 of the Texas Finance Code, from time to time in effect; provided, however, that to the extent permitted by applicable law, LENDER reserves the right to change, from time to time by further notice and disclosure to DEALER by LENDER, the ceiling on which the Maximum Rate is based under the Texas Finance Code; and, provided further, that the Maximum Rate for purposes of this Note shall not be limited to the applicable weekly rate under the Texas Finance Code if federal laws or other state laws now or hereafter in effect and applicable to this Note (and the interest contracted for, charged and collected hereunder) shall permit a higher rate of interest. Chapter 346 of the Texas Finance Code (formerly Tex. Rev. Civ. Stat. Ann. Art. 5069, Ch. 15 and which regulates certain revolving credit loan accounts and revolving tri-party accounts) shall not to this Note or the Loan Documents.

9.7     No Waiver. No delay or omission by LENDER to exercise any right or remedy shall (a) impair any right or remedy; (b) waive any default; or (c) affect any subsequent default, right or remedy of the same or of a different nature.

9.8     **Demand Nature of Credit Facility.** DEALER ACKNOWLEDGES AND AGREES THAT THE FINANCING EVIDENCED BY THIS NOTE IS PAYABLE UPON DEMAND. NOTHING IN THIS NOTE IS INTENDED TO NOR SHALL BE DEEMED TO CHANGE THE DEMAND NATURE OF THIS NOTE, INCLUDING, WITHOUT LIMITATION, ANY REFERENCE TO EVENTS OF DEFAULT, TO ANNUAL FINANCIAL STATEMENTS, TO CURTAILMENT DATES, TO PERIODS, OR OTHERWISE. DEALER ACKNOWLEDGES AND AGREES THAT LENDER, AT ANY TIME, WITHOUT NOTICE AND WITH OR WITHOUT REASON, MAY DEMAND THAT THIS OBLIGATION BE IMMEDIATELY PAID IN FULL. THE DEALER ACKNOWLEDGES THAT DEMAND MAY BE MADE BY LENDER EVEN IF THE DEALER IS IN COMPLIANCE WITH EACH AND EVERY TERM OF THIS NOTE.

9.9     Signature. LENDER and DEALER expressly agree that LENDER may, at LENDER'S option, execute this Note and the documents contemplated hereby by way of an authorized imaged or facsimile signature of a LENDER officer. LENDER and DEALER expressly agree that except as authorized under Section 2.10 on the attached Power of Attorney, DEALER may execute this Note and the documents contemplated hereby by way of an original signature or by way of an imaged or facsimile thereof.

9.10    Enforcement. LENDER and DEALER intend and believe that each provision in this Note complies with all applicable ordinances, laws, statutes and judicial and administrative decisions; however, if any provision in this Note is found by a court of law to be in violation of any

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

applicable ordinances, laws, statutes, judicial or administrative decisions, or public policy, then it is the intent of the parties of this Note that such provision he given force to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such provision were not contained herein and that the remainder of this Note continue in full force and effect.

9.11   **JURISDICTION AND CHOICE OF LAW.** THIS NOTE AND ANY AND ALL AGREEMENTS OR AUTHORIZATIONS EXECUTED BY DEALER OR LENDER IN CONNECTION HEREWITH SHALL BE GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS, AS AMENDED FROM TIME TO TIME, WITHOUT RESORT TO PRINCIPLES OF CONFLICTS OF LAWS. BY EXECUTION OF THIS NOTE, DEALER SUMMIT'S TO THE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF TEXAS AND TO VENUE IN THE FEDERAL AND STATE COURTS LOCATED IN DALLAS COUNTY, TEXAS. ANY ACTION INITIATED BY DEALER AGAINST LENDER RELATING TO THIS NOTE SHALL BE FILED AND CONDUCTED SOLELY IN SAID COURTS. LENDER MAY BRING ANY SUIT AGAINST DEALER UNDER OR RELATED TO THIS NOTE IN ANY COURT OF COMPETENT JURISDICTION, AND DEALER HEREBY CONSENTS TO LENDER'S CHOICE IN FORUM. DEALER FURTHER WAIVES ANY RIGHT WHICH IT MAY HAVE TO REMOVE SUCH LITIGATION OR MATTER TO A FEDERAL COURT OR TO REQUIRE THAT ANY SUCH LITIGATION OR MATTER TAKE PLACE IN A FEDERAL COURT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

9.12   **WAIVER OF JURY TRIAL RIGHTS.** DEALER AND LENDER EACH ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. THEREFORE, EACH PARTY, AFTER CONSULTING, OR HAVING HAD THE OPPORTUNITY TO CONSULT, WITH COUNSEL OF THEIR CHOICE, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY, FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS NOTE AND RELATED AGREEMENT(S), INSTRUMENTS OR TRANSACTIONS, OR ANY ASPECT OF THE PAST, PRESENT, OR FUTURE RELATIONSHIP OF THE PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS AGREEMENT AND THE

TRANSACTIONS CONTEMPLATED HEREBY. Nothing in this section shall be construed as limiting or waiving any right LENDER may have pursuant to Section 9.13 of this Agreement.

9.13   Arbitration. Except as expressly provided elsewhere in this Agreement, or as otherwise expressly agreed to in writing by LENDER, any and all questions or disputes arising from the operation of, the interpretation of, or, in any way connected with, this Agreement *may*, at the unilateral discretion and direction of LENDER, be submitted for final determination via arbitration pursuant to applicable laws of Texas. In the event that litigation has been commenced by the DEALER or guarantor(s), (if any), against LENDER prior to such submission, or if in the event that litigation has been commenced by LENDER against the DEALER, guarantor or any third party, at the sole discretion of LENDER to arbitrate such litigation, all parties to such litigation hereby agree to permanently discontinue, without delay, such litigation upon receipt of 15 days written notice. The arbitration shall be conducted by a single arbitrator. Each party shall select a certified arbitrator. Those arbitrators shall then select one arbitrator who shall arbitrate the case. Any arbitrator selected shall be qualified to conduct commercial arbitrations under the provisions of the applicable laws of Texas. The proceedings before the arbitrator shall take place in Dallas County, Texas or such other place as the arbitrator may direct. The parties to this Agreement, including guarantor(s), (if any), agree and represent to one another that the decision or award of the arbitrator so appointed shall be final and binding upon such parties and shall not be subject to appeal or judicial review. The parties to this Agreement, including the guarantor(s), represent to one another that this section constitutes an express agreement between them to arbitrate in the event that LENDER, in its sole discretion, decides to submit a question or dispute to arbitration. The parties to this Agreement hereby agree that the costs of the arbitration shall be Obligations as defined in this Agreement.

9.14   Title Processing Fees. If LENDER determines that it is necessary or desirable to transfer or convert title or obtain a new or replacement title for any Vehicle, DEALER agrees to pay LENDER a title transfer or processing fee not to exceed $100.00 for each title processed, in addition to all of LENDER's expenses and costs incidental thereto, which shall include, but are not limited to, fees and out-of-pocket expenses incurred by attorneys (including paralegals and similar persons) and any filing fees or taxes.

9.15   Attorneys' Fees Expenses and Costs. In addition to all other amounts payable hereunder by DEALER, DEALER agrees to reimburse LENDER on demand for any and all attorneys' (including paralegals' and similar persons') fees (not less than 15% of the outstanding Obligations where not prohibited by law), accountants' fees, appraisers' fees, and all expenses and costs incurred in collecting or enforcing payment of the Obligations hereunder or in

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

curing any default, including without limitation those fees and costs incurred (a) with or without suit; (b) in any appeal; (c) in any bankruptcy, insolvency or receivership proceeding; and (d) in any post-judgment collection proceedings, plus interest at the rate provided herein.

9.16  <u>Communication</u>. DEALER acknowledges that DEALER is obtaining credit from, or is guaranteeing credit from, LENDER. DEALER authorizes LENDER to share any and all information that it possesses regarding DEALER's account, including but not limited to information regarding DEALER's loan history, account history, account balance, credit worthiness, and inventory vehicle data with any third party. DEALER does hereby authorize LENDER to release and disclose any and all of DEALER's general business information now or hereinafter in LENDER's possession, including but not limited to information regarding the business name, address, and telephone number, to any third party. DEALER also authorizes LENDER to release and disclose any and all of DEALER's account and inventory information now or hereinafter in LENDER's possession, including but not limited to any and all inventory vehicle data loan documents, any business financial information retained or maintained by LENDER, and/or any information relating to the DEALER's performance history with LENDER to any third party. DEALER authorizes LENDER, and its respective affiliates, subsidiaries and parent companies to: a) send facsimile transmissions to DEALER at the facsimile numbers listed as DEALER's facsimile number in any communication sent from time to time by DEALER; b) make telephone calls or send SMS or MMS messages to DEALER at the telephone or mobile numbers listed as DEALER's telephone number or mobile number in any communication sent from time to time by DEALER; c) send emails to DEALER at the email addresses listed as DEALER's email address in any communication sent from time to time by DEALER; and d) communicate to DEALER via any and all other forms of communications, for the purposes of including, but not limited to marketing, collection and any other communication needs. DEALER agrees that this permission will remain in effect until cancelled by DEALER in writing.

9.17  <u>CONSEQUENTIAL DAMAGES</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, DEALER SHALL NOT ASSERT, AND DEALER HEREBY WAIVES, ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS NOTE, ANY OTHER FINANCING DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, ANY ADVANCE OR THE USE OF THE PROCEEDS THEREOF.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

9.18 **Joint and Several.** For sake of clarity, if more than one person or entity executes this Note as DEALER, all of said parties are jointly and severally liable for payment of the indebtedness evidenced by this Note and the performance of the obligations hereunder. If DEALER is a partnership, each general partner of DEALER is jointly and severally liable for the payment and performance obligations of DEALER under this Note, and each general partner waives any requirement of law that LENDER exhausts any assets of DEALER before proceeding against the assets of such general partner.

9.19 **Authorized Representative.** Advances may be made by LENDER to DEALER from time to time based on the request of persons presenting themselves to be authorized representatives of DEALER. LENDER shall have no duty to confirm the identity of such persons. DEALER shall be responsible for the obligations of such persons for Advances in DEALER's name from LENDER.

9.20 **Payments.** For purposes of determining the amount of Obligations, the receipt of any Check or other item of payment to LENDER shall not be effective as payment on account of the Obligations until such Check or other item of payment is actually paid in cash or collected.

9.21 **Time of the Essence.** Time is of the essence in this Note.

## DEALER's Name and DEALER's Place of Business:

RA Auto Group
6900 Gateway E Blvd.
El Paso, Texas 79915

6997 Industrial  El Paso, Tx 79915  repair and storage lot

**WHEREFORE, the DEALER has on behalf of themselves individually and in their representative capacity, executed this Note on Wednesday, October 06, 2021.**

DEALER: **RA Auto Group**

By: _____
    **Alexander Chavira, Owner**

Date: 10-07-21

LENDER: **Vehicle Acceptance Corporation**

By: _____
    Duly authorized VAC Agent

Date: 10-07-21

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

## EXHIBIT "A"

### POWER OF ATTORNEY

KNOW ALL BY THESE PRESENTS:

That in accordance with the Demand Promissory Note and Security Agreement (the "Demand Note") between Vehicle Acceptance Corporation ("LENDER") and RA Auto Group (hereinafter referred to jointly and severally as the "DEALER"), to which reference is made for the meaning of all capitalized terms used herein, a power of attorney is hereby conferred by the undersigned on his or her behalf and on behalf of DEALER upon LENDER, a Texas corporation, the address of the principal office of which is listed in Section 9.4 of the Demand Note or such other place as LENDER may designate:

(a) act with general authority with respect to all personal property of the undersigned or DEALER and transactions involving or relating to the same, including without limitation to collect accounts and receivables and direct account debtors to make payments to LENDER;

(b) act on behalf of the undersigned and DEALER to assign, reassign, or obtain titles in connection with transactions involving Purchase Money Inventory, Collateral and other property of the undersigned or DEALER;

(c) act on behalf of the undersigned and DEALER to prepare, sign, endorse, execute and deliver documents including, but not limited to financing statements, notes, checks, drafts, and titles in connection with transactions involving Purchase Money Inventory, Collateral and other property of the undersigned or DEALER;

(d) act with general authority with respect to claims and litigation of or relating to Purchase Money Inventory, Collateral, and other property of the undersigned or DEALER;

(e) act with general authority with respect to delegating authority;

(f) act with general authority with respect to insurance, and accounts or transactions with banks and other financial institutions, of or relating to Purchase Money Inventory, Collateral, and other property of the undersigned or DEALER; and

(g) act with general authority regarding all other matters which LENDER may, in its sole discretion, deem expedient, reasonable, or necessary in the discharge of the authority hereby conferred — all as if done by the undersigned or DEALER directly.

DEALER hereby indemnifies, defends and holds harmless LENDER and its affiliates and their respective subsidiaries, officers, directors, managers, members, partners, agents, advisors, controlling persons, employees, representatives, successors, and assigns from and against any and all loss, damage, liability, claims, cause of action, and expenses of whatever kind, arising from the exercise of authority hereunder, (IT BEING UNDERSTOOD THAT IT IS THE INTENTION OF THE UNDERSIGNED THAT EACH SUCH INDEMNIFIED PARTY IS INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE, REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL). This power of attorney shall be irrevocable until such time as each and every Obligation of the undersigned and DEALER to LENDER has been satisfied in full. The revocation or termination hereof shall be ineffective unless and until actual notice or knowledge of such revocation or termination shall have been received by the parties acting under this power of attorney. The undersigned represents and warrants that he/she is a duly authorized agent of DEALER and by execution of this Power of Attorney, DEALER is lawfully bound to and obligated by the terms hereof. This power of attorney shall be governed by the substantive laws of the State of Texas without resort to principles of conflicts of law.

**RA Auto Group**

By: _____

Alexander Chavira, Owner

NOTARY SEAL

Date: __10-07-21__

> RODOLFO MARTIN GOMEZ
> Notary Public, State of Texas
> Comm. Expires 10-19-2022
> Notary ID 131765810

STATE OF __TEXAS__

CITY/COUNTY OF __EL PASO__

Before me the undersigned, a Notary Public in and for the said County and State, personally appeared the above-referred individual(s) who acknowledged the execution of the foregoing Power of Attorney this __7TH__ day of __OCTOBER__, __2021__.

_____
(Notary Public Signature)

My Commission Expires: __10-19-22__

Rodolfo Martin Gomez
(Printed Name)

My City/County of Residence: __EL PASO__

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

## EXHIBIT "B"

## UNCONDITIONAL AND CONTINUING GUARANTY

TO:     Vehicle Acceptance Corporation

DATE:    October 6, 2021

FOR VALUE RECEIVED, and in consideration of credit and services given or to be given to RA Auto Group (hereinafter referred to jointly and severally as the "Debtor") by Vehicle Acceptance Corporation ("LENDER"), the undersigned (sometimes hereinafter referred to jointly and severally as "Guarantor" which term shall mean as applicable each of the undersigned individually and all of the undersigned collectively) as hereby jointly and severally (a) guaranty the full and prompt payment, when due, whether by acceleration or otherwise, together with interest and all costs, expenses and attorneys' fees, of any and all obligations (including, without limitation, payment obligations, promises, agreements, warranties, covenants or other obligations, and whether or not present or future, direct or indirect, absolute or contingent, matured or unmatured) of the Debtor to LENDER including without limitation such indebtedness as may be encompassed by the term "Obligations" as defined in the Demand Promissory Note and Security Agreement dated October 6, 2021, by and between LENDER and Debtor, as amended, supplemented or modified from time to time (the "Demand Note"), whether or not such amounts exceed any advance limit applicable to Debtor or communicated to the undersigned, and in each case including all post-filing and post-petition interest and all such other amounts which would become due but for the operation of the automatic stay under Sections 362(a), 502(b) and 506(B) of the Unites States Bankruptcy Code (hereinafter collectively referred to as the "Liabilities"); and (b) indemnifies and holds harmless LENDER for any and all costs and expenses (including reasonable fees and out-of-pocket expenses of external counsel) incurred by LENDER in enforcing any rights under this guaranty (this "Guaranty"), (IT BEING UNDERSTOOD THAT IT IS THE INTENTION OF THE PARTIES HERETO THAT LENDER IS INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE, REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL); provided, however, that Guarantor shall be liable under this Guaranty for the maximum amount of such liability that can be hereby incurred without rendering this Guaranty, as it relates to Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount (such highest amount determined hereunder being Guarantor's "Maximum Liability"). The foregoing proviso with respect to the Maximum Liability of Guarantor is intended solely to preserve the rights of LENDER hereunder to the maximum extent not subject to avoidance under applicable law, and neither Guarantor nor any other person or entity shall have any right or claim under this paragraph with respect to the Maximum Liability, except to the extent necessary so that the obligations of Guarantor hereunder shall not be rendered voidable under applicable Law. Guarantor agrees that the obligations guaranteed hereunder may at any time and from time to time exceed Guarantor's Maximum Liability without impairing this Guaranty or affecting the rights and remedies of LENDER hereunder.

This is an irrevocable, unconditional and continuing guaranty of payment and performance when due and not of collection; it shall cover and secure any amount at any time owing on the Liabilities. Each of the undersigned specifically agrees that it shall not be necessary or required that LENDER exercise any right, assert any claim or demand or enforce any remedy whatsoever against Debtor, Guarantor or any other person or entity before or as a condition to the obligations of Guarantor hereunder. The obligations of Guarantor hereunder are joint and several with Debtor, and are primary obligations for which Guarantor is the principal obligor. There are no conditions precedent to the enforcement of this Guaranty, except as expressly contained herein.

The liability of the undersigned under this Guaranty shall be absolute, unconditional and irrevocable irrespective of: (a) (i) any lack of validity, legality or enforceability of the Demand Note, or any portion of any thereof or (ii) the Demand Note, or any portion of any thereof, being void or voidable; (b) the failure of LENDER (i) to assert any claim or demand or to enforce any right or remedy against Debtor or any other person or entity under the provisions of the Demand Note, or (ii) to exercise any right or remedy against any other guarantor of, or collateral securing, promises, agreements, covenants, warranties, and obligations by Debtor under the Demand Note; (c) any change in all or any of the promises, agreements, covenants, warranties, and obligations by Debtor under the Demand Note, including any change in the time, manner or place of payment of, or in any other term of, any payment obligations of Debtor, or any extension, increase, compromise or renewal of any such payment obligations; (d) any reduction, limitation, impairment or termination of any of the promises, agreements, covenants, warranties, and obligations by Debtor in the Demand Note for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the undersigned hereby waive any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, non-genuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any of the promises, agreements, covenants, warranties, and

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

obligations by Debtor in or under the Demand Note; (e) any amendment to, extension, variance, alteration, rescission, waiver, increase, or other modification of, or any consent to departure from, any of the terms of the Demand Note, or any addition, exchange, release, surrender or non-perfection of any collateral (if any) or other guaranty; (f) any incapacity or disability or lack or limitation of status or power of Debtor or that Debtor may not be a legal entity; (g) insolvency, bankruptcy, liquidation or reorganization or other similar proceeding of Debtor; (h) any change in the name, constitution or capacity of Debtor, or Debtor being merged with another person (in which case this Guaranty shall to the liabilities of the resulting person, and the term "Debtor" shall include such resulting person); and (i) any other circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of Debtor.

The undersigned each hereby waive any and all promptness, diligence, presentment, demand, protest and notice of protest, notice of dishonor, non-payment, default or exercise of remedies with respect to any of the Liabilities, notice of creation or existence of any Liabilities, notice of any amendments, supplements or modifications thereto, notice of any waiver or consent under the Demand Promissory Note and Security Agreement and any related documents, notice of any increase, reduction or rearrangement of Debtor's obligations under the Demand Promissory Note and Security Agreement or notice of any extension of time for the payment of any sums due and payable to LENDER thereunder, and any other notice with respect to any of the the of the promises, agreements, covenants, warranties, and obligations by Debtor under the Demand Promissory Note and Security Agreement. The undersigned each hereby grant to LENDER full power to deal in any manner with the Liabilities without notice to the undersigned, including, but without limiting the generality of the foregoing, the following powers: (a) to modify or otherwise change any terms of all or any part of the Liabilities or the rate of interest thereon, to grant any extension or renewal thereof, and any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto; and (b) to enter into any agreement of forbearance with respect to all or any part of the Liabilities or with respect to all or any part of the collateral related thereto and to change the terms of any such agreement. The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against LENDER by reason of any action LENDER may take or omit to take under the foregoing powers.

If a claim is made upon LENDER at any time for repayment or recovery of any amount(s) or other value received by LENDER, from any source, in payment of or on account of any of the Liabilities of the Debtor guarantied hereunder and LENDER repays or otherwise becomes liable for all or any part of such claim by reason of: (a) any judgment, decree or order of any court or administrative body having competent jurisdiction; (b) any settlement or compromise of any such claim; or (c) any bankruptcy, insolvency, liquidation, reorganization or similar laws, the undersigned shall remain jointly and severally liable to LENDER hereunder for the amount so repaid or for which LENDER is otherwise liable to the same extent as if such amount(s) had never been received by LENDER, notwithstanding any termination hereof or the cancellation of any note, instrument, or other agreement evidencing any of the Liabilities.

Each of the undersigned agrees that, in the event of the dissolution or insolvency of Debtor or any undersigned, or the inability or failure of Debtor or any undersigned to pay debts as they become due, or an assignment by Debtor or any undersigned for the benefit of creditors, or the commencement of any case or proceeding in respect of Debtor or any undersigned under any bankruptcy, insolvency, liquidation, reorganization or similar laws, and if such event shall occur at a time when the Liabilities may not then be due and payable, or when Liabilities of Debtor under the Demand Promissory Note and Security Agreement may not then performable, the undersigned jointly and severally will pay to LENDER forthwith the full amounts which would be payable hereunder by Guarantor if all such Liabilities were then due and payable, and fulfill the Liabilities of Debtor under the Demand Promissory Note and Security Agreement as if they were then fully performable.

In case the Debtor shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms thereof, the undersigned will immediately pay the amount due and unpaid by the Debtor in like manner as if such amount constituted the direct and primary obligation of the undersigned. LENDER shall not be required, prior to any such payment by or demand on the undersigned, to make any demand upon or pursue or exhaust any of its rights or remedies against the Debtor or others with respect to the payment of any of the Liabilities.

Notwithstanding anything to the contrary in this Guaranty, the undersigned each hereby irrevocably waive(s) all rights he/she may have at law or in equity (including, without limitation, any law subrogating the undersigned to the rights of LENDER) to seek contribution, indemnification, or any other form of reimbursement from the Debtor, any other guarantor, or any other person hereafter primarily or secondarily liable for any obligations of the Debtor to LENDER, for any disbursement made by the undersigned under or in connection with this Guaranty or otherwise. The undersigned furthermore waive: (a) all defenses based on suretyship, notice, or impairment of collateral including, without limitation, any rights granted pursuant to Rule 31, Texas Rules of Civil Procedure, Sections 17.001 and 34.005, Civil Practice and Remedies Code, and Chapter 43 of the Civil Practice and Remedies Code; and (b) any and all defenses, set-of or counterclaim which the Debtor may assert on the Liabilities including but not limited to failure of consideration, breach of warranty, fraud, payment, statute of frauds, bankruptcy, lack of legal capacity, statute of limitations, lender liability, accord and satisfaction, and usury.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

This guaranty is in addition to and not in substitution for any other guaranty or other securities which LENDER may now or hereafter hold for all or any part of the Liabilities, and LENDER shall not be under any other obligation to marshal in favor of the undersigned any other guaranties or other securities or any monies or other assets which LENDER may be entitled to receive or may have a claim upon. No loss of or in respect of or unenforceability of any other guaranties or other securities which LENDER may now or hereafter hold in respect of any of the Liabilities, whether resulting from the fault of LENDER or otherwise, shall in any way limit or lessen the undersigned's liability under this Guaranty.

The undersigned understand and agree that no loans made by the undersigned to the Debtor are permitted to be repaid by the Debtor while this Guaranty or any indebtedness to LENDER is outstanding. All debts and liabilities, present and future, of Debtor to the undersigned are hereby assigned to LENDER and postponed to the Liabilities, and all monies received by the undersigned in respect thereof or otherwise in violation of this Guaranty shall be received in trust for LENDER and forthwith upon receipt shall be paid over to LENDER, unless prior written authorization to the contrary has been obtained from LENDER, without in any way lessening or limiting the liability of the undersigned under this Guaranty. This assignment and postponement is independent of the guaranty and shall remain in full force and effect until repayment in full to LENDER of all the Liabilities, notwithstanding that the liability of the undersigned under this Guaranty may have been discharged or terminated.

This guaranty shall not be discharged or otherwise affected by the death or loss of capacity of the Debtor, by any change in the name of the Debtor, or (if a partnership, limited liability company or other membership organization) by any change in the membership of the Debtor or (if a corporation) by any change in the officers, capital structure, by-laws or articles of the Debtor, by the sale of the Debtor's business or any part thereof, by the Debtor being reorganized or being amalgamated with one or more other corporations or other entities, by the Debtor becoming bankrupt or insolvent or by any other matter or thing whatsoever but shall continue to all Liabilities whether incurred before or after any such event. In the case of a change in the membership of the Debtor or in the case of the Debtor being reorganized or being amalgamated with one or more other entities, this Guaranty shall to the liabilities of the resulting entity, and the term "Debtor" includes each such resulting entity. This guaranty shall not be discharged or otherwise affected by the death of the undersigned.

The undersigned hereby represents and warrants to LENDER that (a) this Guaranty has been duly authorized, executed and delivered by the undersigned; (b) this Guaranty is the legal, valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms; (c) the undersigned is solvent within the meaning of the Unites States Bankruptcy Code; (d) the undersigned has by independent means made himself/herself/itself fully aware of Debtor's financial condition; and (e) it is in the best interest of the undersigned to execute this Guaranty inasmuch as the undersigned will derive substantial direct and indirect benefits from the Demand Promissory Note and Security Agreement. The undersigned agrees to pay all costs, expenses, and attorneys' fees incurred by LENDER in the enforcement of this Guaranty. The undersigned hereby waive the right to assert any claim or cause of action to avoid any transfer to LENDER contemplated by and made pursuant to this Guaranty or the Demand Promissory Note and Security Agreement that may exist by virtue of any federal or state statute providing for such avoidance.

Whenever possible each provision of this Guaranty shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

Imaged and facsimile signatures and copies of this Guaranty may be used in lieu of originals, and shall not affect the validity or enforceability of this Guaranty. In making proof of this Guaranty, it shall not be necessary to produce or account for more than one such fully executed counterpart.

THIS GUARANTY SHALL BE GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF TEXAS, AS AMENDED FROM TIME TO TIME, WITHOUT RESORT TO PRINCIPLES OF CONFLICTS OF LAWS. BY EXECUTION OF THIS GUARANTY, THE UNDERSIGNED SUBMITS TO THE PERSONAL JURISDICTION OF THE COURTS OF THE STATE OF TEXAS AND TO VENUE IN THE FEDERAL AND STATE COURTS LOCATED IN DALLAS COUNTY, TEXAS. ANY ACTION INITIATED BY THE UNDERSIGNED AGAINST LENDER RELATING TO THIS GUARANTY SHALL BE FILED AND CONDUCTED SOLELY IN SAID COURTS. LENDER MAY BRING ANY SUIT RELATING TO THIS GUARANTY IN ANY COURT OF COMPETENT JURISDICTION, AND THE UNDERSIGNED HEREBY CONSENTS TO LENDER'S CHOICE OF FORUM. THE UNDERSIGNED FURTHER WAIVES ANY RIGHT WHICH IT MAY HAVE TO REMOVE SUCH LITIGATION OR MATTER TO A FEDERAL COURT OR TO REQUIRE THAT ANY SUCH LITIGATION OR MATTER TAKE PLACE IN A FEDERAL COURT.

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

THE UNDERSIGNED AND LENDER EACH ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. THEREFORE, EACH PARTY, AFTER CONSULTING, OR HAVING HAD THE OPPORTUNITY TO CONSULT, WITH COUNSEL OF THEIR CHOICE, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY, FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS GUARANTY AND THE TRANSACTIONS CONTEMPLATED HEREBY.

All rights, powers, privileges and immunities of LENDER hereunder shall inure to the benefit of the successors and assigns of LENDER, and shall be binding upon each of the undersigned, his/her/its personal representatives, heirs and assigns. The undersigned may not assign any obligations of the undersigned hereunder with the written consent of LENDER.

Time is of the essence in this Guaranty.

THIS GUARANTY REPRESENTS THE FINAL AGREEMENT OF THE UNDERSIGNED AND LENDER WITH RESPECT TO THE SUBJECT MATTER HEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE UNDERSIGNED AND LENDER.

Witness the hand and seal of the undersigned the day and year first above written.

Alexander Chavira, Individually
6231 Viale Lungo Ave.
El Paso, Texas 79932
Driver's License: Texa

STATE OF _TEXAS_                    CITY/COUNTY OF _EL PASO_

Before me the undersigned, a Notary Public in and for the said County and State, personally appeared the above-referred individual(s) who acknowledged the execution of the foregoing Unconditional and Continuing Guaranty this _7TH_ day of _OCTOBOR_, _2021_.

(Notary Public Signature)                My Commission Expires: _10-17-2022_

_Rodolfo Martin Gomez_                My City/County of Residence: _EL PASO_
(Printed Name)

NOTARY SEAL ▶



RODOLFO MARTIN GOMEZ
Notary Public, State of Texas
Comm. Expires 10-19-2022
Notary ID 131786810

© 2019 Vehicle Acceptance Corporation. All Rights Reserved. 20190909 v.7.1

UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Michelle Dicken 2188182308

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Michelle Dicken
901 Main Street
Suite 3450
Dallas, TX 75202
USA

**FILING NUMBER:** 18-0044667541
**FILING DATE:** 12/24/2018     11:07 AM
**DOCUMENT NUMBER:** 857576100002
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR WEB FILING**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **RA Auto Group** | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **6900 Gateway E Blvd** | **El Paso** | **TX** | **79915** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **A&R Chavira LLC** | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **6900 Gateway E Blvd** | **El Paso** | **TX** | **79915** | **USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Vehicle Acceptance Corporation** | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **901 Main Street Suite 3450** | **Dallas** | **TX** | **75202** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtors, whether now owned or existing or owned, acquired or arising hereafter. NOTICE: PURSUANT TO AN AGREEMENT BETWEEN DEBTORS AND SECURED PARTY, DEBTORS HAVE AGREED NOT TO GRANT A SECURITY INTEREST IN THE COLLATERAL DESCRIBED HEREIN TO ANY OTHER PERSON. ACCORDINGLY, THE ACCEPTANCE OF ANY SUCH SECURITY INTEREST IS LIKELY TO CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE RIGHTS OF SECURED PARTY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:



**EXHIBIT**
tabbies®
B

page 2

**UCC FINANCING STATEMENT ADDENDUM**
**FOLLOW INSTRUCTIONS**

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | 9a. ORGANIZATION'S NAME |
|---|---|
| OR | **RA Auto Group** |
| | 9b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

10. DEBTOR'S NAME: Provide (10a or 10b) only <u>one</u> additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | 10a. ORGANIZATION'S NAME |
|---|---|
| OR | |
| | 10b. INDIVIDUAL'S SURNAME |
| | **Chavira** |
| | INDIVIDUAL'S FIRST PERSONAL NAME |
| | **Alexander** |
| | INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **7165 Alameda Ave** | **El Paso** | **TX** | **79915** | **USA** |

11. ☐ ADDITIONAL SECURED PARTY'S NAME <u>or</u> ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only <u>one</u> name (11a or 11b)

| | 11a. ORGANIZATION'S NAME |
|---|---|
| OR | |
| | 11b. INDIVIDUAL'S SURNAME     FIRST PERSONAL NAME     ADDITIONAL NAME(S)/INITIAL(S)     SUFFIX |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral)

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

**FILING OFFICE COPY**

| Vehicle | VIN |
|---|---|
| 2019/Ford/F150/Gry46 | 1FTEW1E56KFB47146 |
| 2020/Jeep/Wrangler/Gry84. | 1C4HJXDN3LW248484 |
| 2017/Ford/Fusion/Gry35 | 3FA6P0LU8HR123535 |
| 2013/Audi/A6/Wht74 | WAUGGAFC1DN092374 |
| 2016/Hyunda/Gnsis/Gry61. | KMHGN4JE9GU115261 |
| 2013/Audi/A5/Wht86 | WAULFAFR1DA059286 |
| 2015/Nissan/NV1500/Wht07 | 1N6BF0KLXFN803907 |
| 2018/Ford/Focus/Wht37. | 1FADP3K24JL262137 |
| 2014/Chevy/Camaro/Slvr51. | 2G1FB3D39E9160751 |
| 2008/Ram/2500/Rd83. | 3D7KS28A48G115483 |
| 2016/Jeep/Wranglr/Wht53 | 1C4HJWDG3GL282153 |
| 2017/VW/Jetta/Gry33 | 3VW2B7AJ0HM232333 |
| 2018/Kia/Optima/Gry02 | 5XXGT4L3XJG212102 |
| 2016/VW/Golf/Gry65 | 3VW217AU2GM029665 |
| 2014/Chryslr/T&C/Slvr00 | 2C4RC1GG2ER412800 |
| 2012/Audi/A6/Blu76. | WAUGGAFC6CN034076 |
| 2016/Acura/MDX/Blk81 | 5FRYD3H47GB001981 |
| 2014/Mits/Lancer/Gry22 | JA32W8FV2EU018622 |
| 2014/Dodge/Chargr/Wht56 | 2C3CDXEJ0EH154856 |
| 2013/Toyot/Prius/Blu15 | JTDKN3DU7D1723515 |
| 2012/VW/GLI/Gry8263. | 3VW5A7AJ6CM088263 |
| 2015/Chrysler/200/Rd10. | 1C3CCCAB5FN648410 |
| 2014/Audi/A5/Gry91. | WAUCFAFRXEA037191 |
| 2013/Audi/Q5/Blk56. | WA1LFAFP0DA054656 |
| 2018/Honda/CRV/Blue87 | 5J6RW2H84JA000987 |
| 2013/Jeep/Wrangler/Red83 | 1C4BJWDG0DL523183 |
| 2016/Buick/Regal/Blk56 | 2G4GR5EX9G9157156 |
| 2019/Ford/F150/Gry84 | 1FTEW1EB4KKC55584 |
| 2015/Chevy/Tahoe/Slver99 | 1GNSCCKC5FR143899 |
| 2018/Ford/F150/Wht46 | 1FTFW1E56JKD33246 |
| 2015/Chevy/1500/Slvr55 | 3GCPCREC9FG365455 |
| 2015/Maserat/Ghibl/Blu36. | ZAM57XSA9F1159436 |



**EXHIBIT**

C